In my view the actions of the insurance adjuster and the carrier's attorney amounted in law to misrepresentation both to the employee and to the Industrial Commission. Since what amounts to misrepresentation under N.C. Gen. Stat. § 97-17 is a question of law rather than of fact, the action of the majority is fully reviewable by the Court of Appeals.
The plaintiff was 33 years old, had completed the 6th grade and was not able to read or write. On August 15, 1994, plaintiff sustained an injury by accident arising out of and in the course of his employment when he was lifting a bulldozer blade to change it to another angle and strained his lower back. At the time of the incident the employee worked as a logger at an average weekly wage of $225 which yields a compensation rate of $150.
Subsequent to the date of injury the defendant carrier began payment of TTD benefits to plaintiff and forwarded an Industrial Commission Form 21 to plaintiff who testified he did not understand what to do with it and therefore did not execute it. Subsequent to submitting the Form 21 to plaintiff, defendant carrier did not inquire nor follow-up regarding execution or submitting of the agreement to the Commission. Defendants failed to file the Form 21 Agreement to Pay Compensation with the Industrial Commission.
Plaintiff was initially evaluated by Dr. Paul Pfleuger of Sylva, North Carolina who diagnosed him with a herniated L5-S1 disk and ordered a myelogram. Dr. Pflueger subsequently referred plaintiff to Dr. Stewart Harley a spine specialist in Asheville. Dr. Harley initially tried conservative care and subsequently performed a lumbar diskectomy at L5-S1 on the right with decompression of the S1 nerve root on October 7, 1994. Dr. Harley continued to follow-up with plaintiff's care and on reexamination on November 21, 1994 Dr. Harley noted plaintiff was doing very well with some occasional pain in his back especially when driving for long periods of time. Dr. Harley reported that plaintiff "does have his job available, that of truck driving, when his back is better . . . we will have him return to his job the second week of January 1995".
On January 11, 1995 Dr. Harley stated plaintiff has reached maximum medical improvement and opined he retained a 10% permanent partial impairment rating to his back. Dr. Harley also noted that Mr. Blevins "has some intermittent lower back pain, it usually last two or three days with associated pain in his leg, but this is intermittent also . . . attimes the pain is quite severe in his leg but he seems quite comfortable today and is moving around quite freely." Dr. Harley then recommended work precautions of "a corset to wear when he works and was told to use a pillow when he is driving his truck" and was released to return as needed.
Thereafter, Mr. Blevins attempted unsuccessfully to return to work for three to four days for the defendant/employer but had to stop due to increasing pain in his back. Defendant employer then informed plaintiff they had no work available which he could perform within his abilities.
After his unsuccessful attempt to return to work plaintiff was contacted by the Mr. Robert Thompson, claims manager for the carrier, to discuss payment of his impairment rating and closing his claim. During these conversations the plaintiff informed Mr. Thompson the employer did not have any suitable work available to the plaintiff and that he could not read or write. Mr. Thompson failed to contact the employer to determine what work, if any, was available for the plaintiff.
Robert Thompson, claims manager for the defendant carrier, testified at the hearing he did not recall Mr. Blevins informing him that he could not read or write. However, Mr. Thompson did not deny such conversation. Mr. Thompson also testified several times he "did not recall" any conversation with the plaintiff where Mr. Blevins notified him that Mr. Blevins had attempted to return to work 3 or 4 days but was unable to do so because of his continuing back problems. However, Mr. Thompson later admitted he was aware that plaintiff had not returned to work and further admitted Mr. Blevins had in fact informed him "that Mr. Millsaps didn't have any work for him."
During these conversations with Mr. Thompson the plaintiff was advised he was only entitled to $4,500 for his impairment rating and told "That's all they could give me on my back." Plaintiff then asked if that was all his back was worth at which point "they told me I could get $10,000." Plaintiff also contends he reported to the carrier that he was not able to read or write. Based on this conversation plaintiff testified he was advised they would send him an agreement to sign with a big red X marked on it which he should sign, have notarized and return to them.
Mr. Thompson admitted he was aware that because suitable work wasn't available plaintiff may be eligible for continuing temporary total disability benefits. When asked if he discussed with Mr. Blevins his rights to ongoing temporary benefits versus payment for his permanency, Mr. Thompson responded he only "informed Mr. Blevins that he was entitled to permanent partial disability benefits."
Upon receipt of the settlement agreement, the plaintiff followed the carrier's instructions by executing it at the big red X and having it notarized by the "tag woman."
Mr. Thompson was specifically asked about how the language that the plaintiff was "was not seeking partial or total wage loss" happened to get into the settlement agreement, to which he responded he did not know. He was then asked:
 A. Did you discuss with him [Mr. Blevins] that he would need to certify he was not seeking partial or total wage loss as a result of his injury?"
A. No, I did not.
Accordingly, there was no discussion or agreement by the parties as to plaintiff's waiver of his rights to partial or total wage loss although the Compromise Settlement Agreement falsely misrepresented that there was.
Subsequent to the telephone conversations between the claims manager and the plaintiff, the file was transmitted to the carrier's attorney for preparation of a clincher agreement. The carrier's attorney testified that he did not receive any written or oral instructions for preparation of the clincher agreement.
On the issue of the unsuccessful return to work the carrier's attorney was asked:
 Q. Before you prepared the agreement were you aware that Mr. Blevins had unsuccessfully returned to work?
A. No, I don't remember if I was.
In preparation of the clincher agreement the carrier's attorney did not attempt to comply with Rule 502 (2) (h) of the Industrial Commission and summarize Mr. Blevins's age, educational level and vocational experience. He explained he did not do this because "I inserted in the clincher that paragraph that states he certifies he is not seeking partial or total wage loss." He then was asked "Who told you to insert the provisions that Mr. Blevins was certifying he is not seeking partial or total wage loss?" He responded "Nobody." Thus it is undisputed that the carrier's attorney unilaterally inserted a new term into the agreement without the consent of Mr. Blevins, or without notifying him in the transmittal letter of such change.
The clincher agreement also stated the "Employer hereby certify thatthey have supplied the N.C. Industrial Commission copies of all vocational, medical and nursing rehabilitation reports, opinions andinformation relative to the employee which Employer or Insurer now haveknowledge of or in their possession." This is a misrepresentation as the insurance carrier was aware that plaintiff had unsuccessfully attempted to return to work, and that the employer could not provide any suitable work to the plaintiff. This is "information relative to the employee" which the insurer had in its possession that was not provided to the Industrial Commission.
The clincher agreement was submitted to then Special Deputy Commissioner Ronnie Rowell who indicated he reviewed the medical records and he was also aware that the plaintiff was receiving benefits but no Form 21 agreement had been filed with the Commission. Deputy Rowell also reviewed the medical records including the January 11, 1995 note indicating plaintiff was released with a 10% impairment rating, given a prescription to wear a corset while working, and a recommendation to utilize a pillow while driving a truck.
Deputy Commissioner Rowell stated he did not consider continuing §97-29 benefits or § 97-30 partial disability benefits and did not feel the need to "call this particular claimant" because he had reached MMI, was rated released to return to work, and had a job to go back to. [which was specifically not true and known to the defendants but not communicated to Deputy Commissioner Rowell] He further stated there was nothing in the medical records or material provided by the defendants "that speaks to a not return to work status . . . I did have a note that he was apparently doing some logging business which to me indicates, you know, some manual type of labor."
Deputy Commissioner Rowell again repeated "based on what I had beforeme at the time there was nothing that indicated to me or was a red flag to me that the person was incapable of returning to work."
Deputy Commissioner Rowell also stated if he knew Mr. Blevins had not returned to work coupled with the notes from Dr. Harley indicating continuing pain in his back, at times which was noted to be severe, and the fact that no Form 21 agreement "would have been a concern . . . . as to a concern, if I was representing this person it would have been a concern for me.
Deputy Commissioner Rowell further stated "if there is something in the medicals or something that I saw that indicated the person had the right to § 97-30, § 97-29 entitlement, then I think that coupled with a no return to work would have been, probably rose to the level that I would have called the individual at that time, especially since he was unrepresented."
The law is well established that once a compromise settlement agreement is approved by the Industrial Commission it may not be set aside "unless it shall be made to appear to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence or mutual mistake of fact." N.C. Gen. Stat. § 97-17.
In this case Deputy Commissioner Pfeiffer made Conclusion of Law No. 3 which ruled "defendants misrepresented to the plaintiff that he may have been entitled to elect a remedy that would be more favorable to him, such as ongoing temporary total disability benefits" and the plaintiff relied on to his detriment, and justify setting aside this clincher agreement.
As to the first conclusion there is no dispute the claim manager called plaintiff to discuss payment of the impairment rating, which was equal to $4,500. First, plaintiff specifically ask the claims manager "is that all I can get?" Even though aware that plaintiff had attempted to return to work and was unsuccessful due to increased pain, and was further aware the employer could not provide suitable work Mr. Thompson failed to advise plaintiff of his right to draw continuing temporary total disability benefits. Mr. Thompson admitted he was aware the plaintiff may be eligible for continued TTD benefits, however, he specifically testified he informed the plaintiff he was entitled to a second opinion. Such a declaration to the plaintiff was false, misleading and a misrepresentation to the plaintiff.
The carrier again misrepresented the agreement to the plaintiff when Mr. Thompson informed Mr. Blevins he would pay $10,000 and he would send some paper for him to sign. However, he specifically failed to discuss this was a final compromise of plaintiff's future rights, or that plaintiff was certifying he was not seeking partial or total wage loss. By his own admission Mr. Thompson at no time discussed waiver of future rights to continued TTD or TPD. Mr. Thompson specifically stated:
 Q. Did you discuss with him that he would need to certify he was not seeking partial or total wage loss as a result of his injury?"
A. No, I did not.
Mr. Thompson was then asked if he could explain how this provision was included in the clincher agreement. He indicated "I do not know."
Mr. Thompson honestly did not know because there was no discussion with plaintiff about complete compromise of his claim, or waiver of his future rights. If, as defendants contend, plaintiff was fully advised by Mr. Thompson of his rights and he voluntarily agreed to waive his future rights, then Mr. Thompson would know how and why this statement was in the agreement. He would have simply stated because that is what we discussed and Mr. Blevins agreed to. However, Mr. Thompson did not state that. Mr. Thompson's response specifically refutes defendants' claim that Mr. Blevins made an informed decision and confirms Deputy Commissioner Pfeiffer's finding of facts and conclusions of law that defendants misled plaintiff.
Because of this misrepresentation Mr. Blevins was not aware he was electing a lump sum compromise settlement, including waiver of his future rights. Accordingly, he was not permitted to make an informed election of remedies which the Supreme Court has held is required. Therefore, Deputy Commissioner Pfeiffer did not commit error in setting aside the clincher agreement on this ground.
Deputy Commissioner Pfeiffer, in Conclusion of Law No. 4, ruled "defendants misrepresented to the Commission that plaintiff had certified that he was not seeking partial or temporary wage loss benefits" based on the failure of the parties to discuss such essential term of the clincher agreement. As set forth hereinabove, by the admission of defendants' own claims manager, there was absolutely no discussion of this term of the agreement. Mr. Thompson mentioned plaintiff's right to a second opinion and his right to permanent partial disability. However, contrary to the defendants' assertion in the clincher agreement, there was never a discussion of plaintiff's waiver of his rights to future TTD or TPD.
Failure of the parties to agree on this term should have triggered the requirements of Industrial Commission Rule 502 (2) (g) and (h) which required defendants to summarize in the agreement "the employee's age, educational level, past vocational training, past work experience, and any impairments, emotional, mental or physical." However by asserting to the Commission that plaintiff waived his future TTD and TPD defendant mislead the Commission into believing compliance with Rule 502 (2) (g) and (h) was not necessary.
In preparation of the clincher agreement the carrier's attorney did not attempt to comply with Rule 502 (2) (h) and summarize Mr. Blevins's age, educational level and vocational experience. He explained he did not do this because "I inserted in the clincher that paragraph that states he certifies he is not seeking partial or total wage loss." However, when asked "Who told you to insert the provisions that Mr. Blevins was certifying he is not seeking partial total wage loss?" He responded "Nobody." Mr. Lathrop's admission further supports the deputy's conclusion that Mr. Lathrop unilaterally inserted a new term into the agreement without the consent of Mr. Blevins, or Mr. Thompson, which fact was not communicated to the Commission.
Accordingly, Deputy Commissioner Pfeiffer's Conclusion of Law No. 3 and 4 are supported by not only the testimony of Mr. Blevins, but also the admissions of Mr. Thompson and the carrier's attorney and should be affirmed.
Defendants have taken exception to Deputy Commissioner Pfeiffer's Finding of Fact No. 13 which states "in addition, despite the adjuster having actual knowledge that plaintiff had unsuccessfully attempted to return to work, and that the defendant-employer had no other suitable employment available for plaintiff, the adjuster did not impart this information to counsel. Accordingly, this significant piece of information was absent from the terms and provisions of the compromise settlement agreement."
This finding of fact is based on the defendants misrepresentation to the Commission that they "certify that they have supplied the N.C.Industrial Commission copies of all vocational, medical and nursing rehabilitation reports, opinions and — information relative to theemployee, which Employer or Insurer now have knowledge — or in their possession."
Robert Thompson, the claims manager, admitted he was aware Mr. Blevins had unsuccessfully attempted to return to work, and that the employer could not provide work suitable to his capacity. He further admitted he knew the plaintiff might have been eligible for continuing TTD benefits until he returned to work. In spite of this "information relative to the employee" which the insurer did "have knowledge of," this relevant information was not "supplied to the N.C. Industrial Commission." As Deputy Commissioner Rowell testified, if he was aware of the unavailability of a job or the inability to work he would not have approved the agreement.
Pursuant to N.C. Gen. Stat. § 97-17 the Compromise Settlement Agreement must be set aside.
This 22nd day of March 2002.
 S/_____________________________ THOMAS J. BOLCH COMMISSIONER